## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI) | CIVIL ACTION NO. MDL 875 |
| PAULA ROBERTSON, as Successor-in-Interest to and Wrongful Death Heir of JOHN ROBERTSON, Deceased, <br><br> Plaintiffs, <br><br> v. <br><br> CARRIER CORPORATION, et al, <br><br> Defendants. | ED-PA Case No.: 2:09-cv-64068-ER <br><br><br> (Transferor District Court No.) <br> ND-CA Case No.:  No.: 3:08-cv-04490-BZ |

## MOTION FOR SUMMARY JUDGMENT

## OF DEFENDANT HUNTINGTON INGALLS INCORPORATED,

## FORMERLY KNOWN AS NORTHROP GRUMMAN SHIPBUILDING, INC.

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   FACTS .............................................................................................. 2

III.  ARGUMENT ..................................................................................... 3

      A.    Summary Judgment Standard ................................................. 3

      B.    Plaintiffs' Claims Arising Out of Decedent's Alleged Exposure to
            Asbestos on the USS Enterprise Fail as a Matter of Law ............... 4

            1.    There is No Evidence of Exposure to Asbestos-Containing
                  Products on Board the *USS Enterprise* that Were
                  Originally Installed by Huntington Ingalls' Predecessors. .............. 4

                  a.    Under applicable law, Huntington Ingalls is not
                        liable for replacement parts installed after the
                        ship's original construction ............................................ 4

                  b.    Decedent would not have been exposed to any
                        asbestos-containing products originally installed
                        by Huntington Ingalls ................................................... 9

            2.    Plaintiffs' Claims Arising Out of Exposure During the
                  Overhaul at Newport News Are Barred Under Virginia
                  Law ............................................................................... 10

            3.    Plaintiffs' Claims Are Barred by the Government
                  Contractor Defense Because the *USS Enterprise* Was
                  Built in Accordance with U.S. Navy Specifications and
                  Under the Navy's Strict Supervision and Control ....................... 11

                  a.    The government contractor defense is a complete
                        bar to plaintiffs' claims and can be decided as a
                        matter of law ............................................................ 11

                  b.    The first prong of the government contractor
                        defense is met because the U.S. Navy approved
                        reasonably precise specifications for the
                        construction of the *USS Enterprise* ............................... 13

                  c.    The second prong of the defense is satisfied
                        because the *USS Enterprise* conformed to the
                        Navy's specifications .................................................. 15

           d.      The U.S. Navy's state-of-the-art knowledge concerning the potential risks associated with exposure to asbestos satisfies the third prong of *Boyle* ................................................................................... 15

    4.     Plaintiffs' Failure to Warn Claims Fail as a Matter of Law Because Huntington Ingalls Had No State Law Duty to Warn the U.S. Navy of the Potential Hazards of Exposure to Asbestos Because the U.S. Navy Was a Sophisticated User ............................................................................................. 17

    5.     Even if Huntington Ingalls Had a Duty to Warn Under Virginia Law, It Would Be Immune From Liability Because the Government Contractor Defense is a Complete Defense to Plaintiffs' Failure-to-Warn Claims ................ 18

           a.      The government contractor defense applies to failure to warn claims .......................................................... 18

           b.      The U.S. Navy controlled the content of warnings on the *USS Enterprise* and would have rejected an attempt by Huntington Ingalls to warn about asbestos .............................................................................. 19

IV.     CONCLUSION ................................................................................................. 19

HUNTINGTON INGALLS INCORPORATED'S
MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Akin v. Ashland Chemical,* 156 F.3d 1030, 1037 (10th Cir. 1998)..................................... 17

*Beaver Valley Power Co. v. National Engineering & Contracting Co.,*
    883 F.2d 1210, 1216 (3d Cir. 1989) ............................................................. 16

*Boyle v. United Technologies Corp.,*
    487 U.S. 500 (1988)..................................................... 11, 12, 13, 14, 15, 16, 18

*Brinson v. Raytheon Co.,*
    571 F.3d 1348 (11th Cir. 2009) ....................................................................... 12

*Butler v. Ingalls Shipbuilding,*
    *Inc.,* 89 F.3d 582 (9th Cir. 1996) .......................................................... 11, 12, 19

*Celotex Corp. v. Catrett*
    477 U.S. 317, 322 (1986).................................................................................. 3

*Chicano v. General Electric Co.,*
    2004 WL 2250990 *12 (E.D.Pa. 2004)....................................................... 13, 16

*Conner v. Alfa Laval, Inc.*
    ___ F. Supp. 2d ___, 2011 WL 3101810 (E.D. Pa. July 22, 2011) (Robreno, J.) ..................... 5

*Conoshenti v. Pub. Serv. Elec. & Gas Co.,*
    364 F.3d 135 (3d Cir. 2004) ............................................................................. 4

*East River S.S. Corp. v. Transamerica Delaval, Inc.,*
    476 U.S. 858, 865, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)....................................... 4

*Faddish v. General Electric Co.,*
    2010 WL 4146108, *7 (E.D.Pa. 2010)................................................................ 18

*Gitto v. A.W. Chesterton Co., Inc. (In re Asbestos Liability Litigation*
    *(No. VI)),* No. 07-73417, 2010 WL 3369484, *5 (E.D.Pa. June 30, 2010) ............................... 9

*Grahn v. Tosco Corporation* (1997) 58 Cal.App.4th 1373.......................................... 8

*Hogan v. Miller* (1957) 153 Cal.App.2d.............................................................. 8

*In re Air Disaster at Ramstein Air Base, Germany,*
    81 F.3d 570, 575 (5th Cir. 1996) ..................................................................... 15

*In re Asbestos Cases,*
    960 F.2d 806, 813 (9th Cir. 1992)..................................................................... 19

*In re: "Agent Orange" Product Liability Litigation,*
    304 F.Supp.2d 404, 434 (E.D.N.Y. 2004) ....................................................... 11, 15

*Kerstetter v. Pacific Sci. Co.,*
    210 F.3d 431, 435 (5th Cir. 2000) ................................................................... 15

iv

*Koutsoubos v. Boeing Vertol,*
    755 F.2d 352, 355 (3d Cir. 1985) ................................................................ 13

*Lewis v. Babcock Industries, Inc.,*
    985 F.2d 83 (2d Cir. 1993) ................................................................ 12, 15

*Lindstrom v. A-C Product Liability Trust,*
    424 F.3d 488 (6th Cir. 2005) ................................................................ 9

*Maguire v. Hughes Aircraft Corp.,*
    912 F.2d. 67 (3d Cir. 1990) ................................................................ 11, 12

*Matsushita Electrical Industry Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ................................................................ 4

*Miller v. Diamond Shamrock Co.,*
    275 F.3d 414 (5th Cir. 2001) ................................................................ 11, 12, 15

*Oliver v. Oshkosh Truck Corp.,*
    96 F.3d 992 (7th Cir. 1992) ................................................................ 11

*Peterson v. Superior Court,*
    10 Cal.4th 1185 (1995) ................................................................ 5

*Ramey v. Martin-Baker Aircraft Co.,*
    874 F.2d 946 (4th Cir. 1989) ................................................................ 12

*Russek v. Unisys Corp.,* 921 F.Supp.
    1277, 1292 (D.N.J. 1996) ................................................................ 18

*San Francisco Unified School Dist. v. W.R. Grace & Company - Connecticut*
    (1995) 37 Cal.App.4th 1318 ................................................................ 8

*Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th ................................................................ 8

*Saratoga Fishing Co. v. J.M. Martinac & Co.,*
    520 U.S. 875, 878, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) ................................................................ 4

*Singletary v. Pa. Dep't of Corr.,*
    266 F.3d 186, 192 n.2 (3d Cir. 2001) ................................................................ 4

*Sisson v. Ruby*
    497 U.S. 358 ................................................................ 5

*Sundstrom v. McDonnell Douglas Corp.,*
    816 F.Supp. 587 (N.D.Cal. 1993) ................................................................ 15

*Tate v. Boeing Helicopters,*
    140 F.3d 654 (6th Cir. 1998) ................................................................ 12

*Taylor v. Elliott Turbomachinery Co,. Inc.*
    (2009) 171 Cal.App.4th 564 ................................................................ 5

v

**Statutes**

Fed. R. Civ. P. 56(c) ................................................................................................ 3

Fed. R. Civ. P. 56(e)(2) ........................................................................................... 4

HUNTINGTON INGALLS INCORPORATED'S
MOTION FOR SUMMARY JUDGMENT

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   INTRODUCTION

Plaintiffs Paula Robertson and Diana Spint ("Plaintiffs") filed their second amended complaint for the asbestos-related wrongful death of decedent John Robertson ("Decedent" or "Robertson") against Huntington Ingalls Incorporated, formerly known as Northrop Grumman Shipbuilding, Inc., and formerly known as Newport News Shipbuilding and Dry Dock Company ("Huntington Ingalls") on September 15, 2011. Plaintiffs contend that Decedent was exposed to asbestos during his service in the U.S. Navy on the *USS Enterprise* (CVN-65) from July 1968 to February 1970. The *USS Enterprise* is a nuclear-powered aircraft carrier built by Newport News for the U.S. Navy and commissioned November 25, 1961. The ship entered the Newport News shipyard for overhaul, repairs and refueling in or about September 1969.

This case is somewhat unique in that the alleged asbestos exposure on the *USS Enterprise* occurred both at sea (governed by maritime law) and in port at Newport News, Virginia (governed by Virginia law). Huntington Ingalls is entitled to summary judgment as a matter of law under both maritime and Virginia law. Huntington Ingalls asserts that a U.S. Navy ship is not a "product" and it is not a "manufacturer." Moreover, Plaintiffs cannot demonstrate substantial causation for purposes of liability under either body of law and the government contractor defense bars all of the asserted claims.

Plaintiffs cannot prove that Huntington Ingalls negligently constructed the *USS Enterprise* or that it can be held legally responsible for an allegedly dangerous condition on the ship more than 7 years after it was delivered to the U.S. Navy. The existence of a legal duty is a question of law that is appropriately determined on a motion for summary judgment.

Moreover, plaintiffs cannot demonstrate any alleged exposure to asbestos-containing materials originally installed by Huntington Ingalls. The *USS Enterprise* had been commissioned by the U.S. Navy and in service for more than seven years prior to being boarded by decedent, during which time all of the original packing and most of the original gasket material would have been replaced. There is no evidence that the gaskets on the air conditioning and refrigeration equipment contained asbestos or that Decedent worked with original equipment

HUNTINGTON INGALLS INCORPORATED'S
MOTION FOR SUMMARY JUDGMENT

gaskets. Under maritime law, which applies to exposures involving naval personnel on U.S. Navy vessels at sea, Huntington Ingalls cannot be liable for asbestos-containing replacement parts manufactured and installed by others.

Even if plaintiffs could prove exposure from originally installed asbestos-containing materials on the *USS Enterprise*, Huntington Ingalls is a government contractor and is afforded the same immunity from claims arising out of military equipment built for the United States Navy that is extended to the federal government. Ships constructed by Huntington Ingalls for the U.S. Navy were designed and built in accordance with precise specifications provided by the Navy which covered every aspect of their construction, including the material composition of the components parts and the accompanying written materials and warnings. Plaintiffs' design defect and failure to warn claims against Huntington Ingalls are precisely the type of "second-guessing" of the government's policy decisions with respect to military equipment that the government contractor defense is intended to prevent. Ships built for the U.S. Navy in accordance with Navy design and specifications are the archetypical military equipment for which Huntington Ingalls should be shielded from liability by the government contractor defense.

To the extent that Plaintiffs contend that Decedent was exposed to asbestos from thermal insulation during the overhaul of the *USS Enterprise* at Newport News, the claims are barred by the Virginia Workers Compensation Act. It should also be noted that the Commonwealth of Virginia has recognized the "sophisticated user" defense and does not impose strict liability for allegedly defective products.

## II. FACTS

Plaintiffs contend that Decedent developed lung cancer as a result of exposure to asbestos and asbestos-containing products during his service in the U.S. Navy as a petty officer in charge of the air conditioning and refrigeration equipment on the *USS Enterprise* between 1968 and 1970. Mr. Robertson was examined with respect to this alleged exposure at his deposition. He testified that he was responsible for the repair of air compressors on the refrigeration units, centrifugal air conditioning chill water units, and air conditioning units in the classified areas of

the ship.  This work included the repair of valves, pistons, and bearings on the units and the removal of certain gaskets.  Significantly, Robertson admitted that he did not disturb any thermal insulation while working with the air conditioning and refrigeration equipment.  He also could not identify the gasket or packing materials as asbestos-containing.  Robertson testified that his crew was responsible for replacing chill water lines when the *USS Enterprise* was at Newport News Shipyard and that other workers performed rip-out of thermal insulation during this project.  He did not live on the ship at this time but reported to it to work under the supervision of Navy personnel.  See Plaintiffs' Deposition testimony and Second Amended Complaint attached to the Declaration of Daniel J. Kelly and Plaintiff's Responses to Defendant Huntington Ingalls Incorporated's Special Interrogatories, Set One, Resp. No. 1, Exhibit 2 to the Declaration of Admiral Roger B. Horne, Jr. ("Horne Decl.").

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is proper in any case where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c).  The plain language of Rule 56(c) "mandates" the entry of summary judgment against a party who fails to make a sufficient showing of the existence of an essential element of his or her case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* at 327 (citing Federal Rule of Civil Procedure 1).  "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."  *Id.*

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the

nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004), quoting *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001). Once the moving party has discharged its burden, the nonmoving party 'may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *Anderson*, 477 U.S. at 249; *see also Matsushita Electrical Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The sufficiency of the evidence presented by the nonmoving party must be evaluated in light of the burden of proof the nonmovant will have at trial. *Anderson*, 477 U.S. at 254. If the evidence presented will not carry the nonmovant's burden of proof at trial, then summary judgment is appropriate, even if the nonmovant provides some evidence in opposition to the motion. *Id.*

**B.    Plaintiffs' Claims Arising Out of Decedent's Alleged Exposure to Asbestos on the USS Enterprise Fail as a Matter of Law**

    **1.    There is No Evidence of Exposure to Asbestos-Containing Products on Board the *USS Enterprise* that Were Originally Installed by Huntington Ingalls' Predecessors.**

        **a.    Under applicable law, Huntington Ingalls is not liable for replacement parts installed after the ship's original construction**

Plaintiffs' negligence and strict liability claims for exposure on the *USS Enterprise* at sea must be analyzed under maritime law which is "'an amalgam of traditional common-law rules, modifications of those rules, and newly created rules,' drawn from both state and federal sources." *Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875, 878, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) (quoting *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 865, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) ). The complaint alleges that Huntington Ingalls manufactured "asbestos" and "asbestos-containing products" without any specification of the alleged "product." In a detailed analysis of admiralty and maritime jurisdiction, this Court has properly determined that maritime law applies to asbestos negligence and product liability

litigation where the alleged exposure occurred on a Navy ship (satisfying the "location" test) as a result of the plaintiffs' maintenance and operation of equipment aboard the ship (satisfying the two-part "connection" test).  See *Sisson v. Ruby* 497 U.S. 358 and *Conner v. Alfa Laval, Inc.,* ___ F. Supp. 2d ___, 2011 WL 3101810 (E.D. Pa. July 22, 2011) (Robreno, J.)

    Huntington Ingalls respectfully submits that the U.S. Navy ship at issue is not a "product" within the scope of the asserted strict products liability claims.  Although certain jurisdictions have recognized that a manufacturer of mass produced development homes sold to consumers could be held responsible for defects in the homes, there is no case that holds that a shipbuilder building a warship for the U.S. Navy is a "manufacturer" of a "product."  A U.S. Navy ship is not a "product" and seamen serving on the ship or a worker repairing it should not be considered "consumers" such that strict liability should apply.  A ship is much more like a building for which strict liability claims are not applicable.  In *Peterson v. Superior Court*, 10 Cal.4th 1185 (1995), the California Supreme Court held that a lessee of hotel premises was not strictly liable for the defective condition of a bathtub on the premises.  Similarly, it follows that the general contractor building the hotel would not be held strictly liable for "defects" in the bathtub either.

    This issue was discussed in the context of an asbestos exposure claim on a U.S. Navy ship in *Taylor v. Elliott Turbomachinery Co,. Inc.* (2009) 171 Cal.App.4th 564.  The *Taylor* court explained that a defendant must be in the "stream of commerce" of a product to be subject to strict liability, stating:

> In *Peterson*, the California Supreme Court considered whether a hotel owner could be held strictly liable for injuries sustained when a hotel guest slipped in the bathtub of her guest room. (*Peterson, supra,* 10 Cal.4th at pp. 1189, 1190, 43 Cal.Rptr.2d 836, 899 P.2d 905.)  The plaintiff in *Peterson* alleged that the bathtub was defective because it " 'was so smooth, slippery, and slick as to have provided no friction or slip resistance whatsoever.' " (*Id.* At p. 1189, 43 Cal.Rptr.2d 836, 899P.2d 905.)  Overruling its earlier decision in *Becker v. IRM Corp.* (1985) 38 Cal.3d 454, 213 Cal.Rptr. 213, 698 P.2d 116, the *Peterson* court held that "it would be improper to impose strict liability under products liability principles upon a hotel proprietor for injuries caused by an alleged defect in the hotel premises that the hotel proprietor did not create or market." (*Id.* at p. 1188, 43 Cal.Rptr.2d 836, 899 P.2d 905.)  The court reasoned that the rationales for imposing strict liability on manufacturers or retailers did not apply to the hotel owner because the owner was not part of "the chain of distribution" of the bathtub

> that allegedly caused the injury. ( *Id.* at p. 1199, 43 Cal.Rptr.2d
> 836, 899 P.2d 905.) As a consequence, the hotel owner lacked a
> continuing business relationship with the manufacturer, and thus
> could not exert pressure upon the manufacturer of the defective
> product to make the product safe. (*Ibid.*; compare *Vandermark,*
> *supra,* 61 Cal.2d at pp. 262–263, 37 Cal.Rptr. 896, 391 P.2d 168
> [retailers may be strictly liable because they "are an integral part of
> the overall producing and marketing enterprise" and thus "may be
> in a position to exert pressure on the manufacturer" to make the
> product safe].)

*Taylor,* 171 Cal.App.4th. at pp.577-578.

Huntington Ingalls, like the premises owner in *Peterson*, should not be held strictly liable for alleged defects in equipment installed on ships it built. The use of the products and equipment does not put Huntington Ingalls in the "stream of commerce" for the asbestos-containing materials and products. Moreover, the ship at issue was designed by naval architects and built to government specifications. As such, it should be considered more like custom-built properties rather than mass-produced products. None of the public policy reasons for holding product manufacturers strictly liable for defects apply to a builder of U.S. Navy ships. As a consequence, plaintiffs cannot proceed against Huntington Ingalls on a strict liability theory. This issue was addressed in an unpublished opinion by the Sixth Circuit Court of Appeals in *Stark v. Armstrong World Industries, Inc.*, 21 Fed.Appx. 371, 2001 WL 1216977 (6th Cir. (Ohio). In *Stark,* the court affirmed a summary judgment in favor of shipbuilder Bethlehem Steel on the basis that plaintiff provided no proof of a specific defect in the ship. The court also noted that no other court had found an ocean-going commercial ship to be the equivalent of a normal "product" for all purposes under Restatement (Second) of Torts, § 402A (1965). In *Lindstrom v. A-C Prod. Liab. Trust,* 424 F.3d 488 (6th Cir. 2005), the court accepted the *Stark* approach to causation under maritime law, stating:

> We have required that a plaintiff show, for each defendant, that (1)
> he was exposed to the defendant's product, and (2) the product was
> a substantial factor in causing the injury he suffered.
>
> \*　　　\*　　　\*
>
> "Minimal exposure" to a defendant's product is insufficient. *Id.*
> Likewise, a mere showing that defendant's product was present
> somewhere at plaintiff's place of work is insufficient. *Id.* Rather,
> where a plaintiff relies on proof of exposure to establish that a
> product was a substantial factor in causing injury, the plaintiff

6

> must show " 'a high enough level of exposure that an inference
> that the asbestos was a substantial factor in the injury is more than
> conjectural.'" *Id.* (quoting *Harbour v. Armstrong World Indus.,
> Inc.,* No. 90-1414, 1991 WL 65201, at *4 (6th Cir. April 25,
> 1991)).

*Lindstrom*, 424 F.3d at p. 492

In this case, Plaintiffs seek to avoid the requirement of product identification/causation

by simply defining the *USS Enterprise* as the "product." Clearly, under the *Stark* and *Lindstrom*

analysis, the *USS Enterprise* was Robertson's "place of work" on which numerous products were

installed and used but it should not itself be considered a "product." There is simply no public

policy rationale that would merit the imposition of strict liability against a shipbuilder for the

alleged "defect" of the use of asbestos materials specified by the U.S. Navy. As noted by the

*Stark* court, "the design decisions for a customized vessel are frequently decisions made by

professionals (or the client) rather than by the manufacturer. Architects, including naval

architects, are generally not subject to products liability actions." *Stark*, 2001 WL 1216977. It is

clear that the design decisions for the ship at issue were made by the U.S. government and its

agents, not Huntington Ingalls.

Plaintiffs assert that the presence of asbestos on the *USS Enterprise* was a defective and

dangerous condition. This is akin to a premises liability claim. As such, the essential elements

of ownership and control over the property are central to finding a duty of care. It is beyond

dispute that the *USS Enterprise* was not under the control of Huntington Ingalls at the time of the

alleged exposure at sea. Huntington Ingalls was a government contractor that had completed

construction of the ship more than 7 years prior to the alleged exposure. When decedent was

onboard the *USS Enterprise*, the ship was under the control of the United States Government. In

this case, the *USS Enterprise* is much more like a premises or a work of improvement than a

product and plaintiffs' claims should be analyzed accordingly under maritime law.

Plaintiffs contend that the ship at issue was "defective" because Huntington Ingalls used

materials and equipment that contained asbestos during the original construction in 1958. Under

California law, in the absence of contamination, the installation of asbestos-containing materials

in a work of improvement does not constitute defective construction giving rise to a cause of

action in tort.  As aptly stated in *San Francisco Unified School Dist. v. W.R. Grace & Company -
Connecticut* (1995) 37 Cal.App.4th 1318:

> Physical injury resulting from asbestos contamination, not the
> mere presence of asbestos, must have occurred before a cause of
> action for strict liability or negligence can accrue in an asbestos-in-
> building case and the limitations period commence.

*W.R. Grace*, at p. 1330.  See also *Grahn v. Tosco Corporation* (1997) 58 Cal.App.4th 1373,

1397-1398 and *O'Neil v. Crane Co.* [the mere presence of asbestos-containing materials is not a

dangerous condition].  Huntington Ingalls respectfully submits that this analysis should apply to

the claims governed by maritime law.

Huntington Ingalls is not responsible for injuries allegedly caused by the condition of a

U.S. Navy ship after the ship has been accepted by the Navy.  The general rule applicable to

premises liability actions is that "when a contractor's work has been completed and accepted by

the owner, the contractor is not thereafter liable to third persons for injury suffered by reason of

the condition of the work." *Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461,

1468, quoting *Hogan v. Miller* (1957) 153 Cal.App.2d 107, 111.  In *Sanchez*, the court noted that

in order to hold a contractor liable for a dangerous condition after the owner has accepted the

work of improvement, ***the condition must be unknown to the owner at the time of injury***.

[emphasis added] 47 Cal.App.4th at 1470-1471.

This same general rule should apply to Huntington Ingalls in this case.  There is no

evidence that the asbestos-containing materials and equipment, as originally used or installed by

Huntington Ingalls, constituted a "dangerous condition."  It is undisputed that the U.S. Navy

accepted the ship and operated it for years prior to the alleged exposure events.  Thus, it is

beyond dispute that the U.S. Navy was aware of the condition and that it cannot be considered a

latent defect.

Plaintiffs also bear the burden of proof with respect to causation.  In order to establish

causation in an asbestos products liability claim under maritime law, a plaintiffs must show, for

each defendant that "(1) decedent was exposed to the defendant's product, and (2) the product

was a substantial factor in causing the injury he suffered." *Lindstrom v. A-C Product Liability*

*Trust*, 424 F.3d 488, 492 (6th Cir. 2005). A defendant is only legally responsible for component parts that it manufactured or distributed. *Id.* at 494-95. Therefore, under maritime law, a manufacturer is not liable for replacement parts (e.g., gaskets, packing, and insulation) manufactured and distributed by others. *Id.* at 496-97; *Gitto v. A.W. Chesterton Co., Inc. (In re Asbestos Liability Litigation (No. VI))*, No. 07-73417, 2010 WL 3369484, *5 (E.D.Pa. June 30, 2010). As the builder of a U.S. Navy ship, Huntington Ingalls is simply not responsible for equipment, products, and replacement parts designed, manufactured, and distributed by others.

**b.    Decedent would not have been exposed to any asbestos-containing products originally installed by Huntington Ingalls**

The *USS Enterprise* was built and commissioned years before it was boarded by Decedent. The availabilities occurred several years after Commissioning. It would have been impossible to identify originally installed asbestos-containing products that still existed on the ships. U.S. Navy ships undergo ongoing overhaul, repair, and replacement of expendable as well as damaged parts and materials during its service life. Worn or damaged materials including, but not limited to, thermal insulation, gaskets, packing, and pipe covering, are frequently removed and replaced by Navy shipyards using materials and parts specified, ordered, and installed by a particular Naval shipyard without the knowledge or control of the shipbuilder as to the type or nature of the replacement material or the method of its installation. The rigors of combat also required the frequent replacement of damaged materials. Accordingly, the report of Admiral Roger B. Horne, Jr., attached as Exhibit 1 to his declaration, establishes that there would have been no original packing and limited gasket and insulation material on the *USS Enterprise*, would have remained on the ship at the time Mr. Robertson boarded it.

Plaintiffs cannot prove Decedent was exposed to asbestos from any gaskets, packing, or insulation material originally installed by Ingalls or Newport News. In fact, certified industrial hygienist, Sheldon H. Rabinovitz, concluded that Robertson was not exposed to a dose of asbestos that would increase his risk of developing any fibrotic asbestos-related disease or lung cancer from replacing some gaskets on equipment, from being in areas while others handled gaskets and packing on pumps or valves in the ship or from any possible release of asbestos from

insulation or any other asbestos containing products that may have been on the *USS Enterprise* for about one and one half years. Rabinovitz Decl., ¶ 9. Huntington Ingalls is entitled to summary judgment.

> ### 2.    Plaintiffs' Claims Arising Out of Exposure During the Overhaul at Newport News Are Barred Under Virginia Law

Plaintiffs also contend that Robertson was exposed to asbestos during the time that he and his crew installed new chill water lines on the *USS Enterprise* during its repair, overhaul, and refueling at Newport News Shipyard in 1969-1970. Given that this is a land-based exposure claim, it must be analyzed under Virginia law.

Based on the testimony of Robertson, it is clear that he was engaged in the overhaul and repair of the *USS Enterprise* at the time of his alleged shipboard exposure to thermal insulation at Newport News Shipyard. He and his crew reportedly installed chill water lines as part of the project. In *Gibbs v. Newport News Shipbuilding and Dry Dock Co., Newport News* the Newport News Circuit Court addressed a nearly identical situation and held that the wrongful death claims were barred by the Virginia Workers Compensation Act. *Virginia Code §65.2-307; Pfiefer v. Krauss Construction Co.*, 262 Va. 262, 266 (2001) cited in *Hudson v. Jarrett*, 269 Va. 24, 29 (2005). In *Gibbs*, the court held that a member of the U.S. Navy working on the pre-commission preparation of the submarine *USS Lewis & Clark* was barred from suing Huntington Ingalls for injuries allegedly caused by exposure to asbestos at the shipyard. The court noted that the U.S. Navy contracted with the shipyard for the construction of the submarine and assigned its own personnel to work alongside the shipyard workers and reasoned that just as a shipyard worker could not sue the United States for injuries caused by a service member on the ship, a member of the U.S. Navy could not sue the shipyard. Under these circumstances, the service member would be considered a statutory co-employee of the shipyard under the authority of *Evans v. Hooks*, 239 Va. 127, 131 (1990). Under the circumstances here presented, Robertson was a statutory co-employee of Huntington Ingalls and cannot sue it for injuries allegedly caused by his exposure to asbestos on the *USS Enterprise* at Newport News Shipyard.

The Commonwealth of Virginia has recognized the "sophisticated user" defense but it

does not recognize strict product liability. *Featherall v. Firestone*, 219 Va. 949, 962 (1979);
*Willis v. Raymark Indus., Inc.*, 905 F.2d 793, 796 (4th Cir. 1990); and *Goodbar v. Whitehead
Bros.*, 591 F.Supp 552, 557 (W.D. Va. 1984), aff'd 769 F.2d 213 (4th Cir. 1984). These cases
state the general rule that "a manufacturer is not an insurer of its product's safety" and that it has
a duty to warn only if it knows or has reason to know that its product is dangerous. *Owens-
Corning Fiberglas Corp. v. Watson*, 413 S.E.2d 630 (Va. 1992). An essential corollary is that
where the "user" has superior knowledge with respect to the dangerous propensities of a product,
there is no duty to warn. Similarly, the legal duty applies on to one's own products and does not
extend to the products of other manufacturers. *Featherall; Morgan Indus.*, 471 S.E.2d 489 (Va.
1996). While not conceding that a Navy warship is a "product" in this context, Huntington
Ingalls asserts that a balancing of the applicable factors demonstrates that Huntington Ingalls was
not required to warn the U.S. Navy or its service members of the potential hazards of asbestos-
containing materials or equipment present on the *USS Enterprise*.

> ### 3. Plaintiffs' Claims Are Barred by the Government Contractor Defense Because the *USS Enterprise* Was Built in Accordance with U.S. Navy Specifications and Under the Navy's Strict Supervision and Control
>
> #### a. The government contractor defense is a complete bar to plaintiffs' claims and can be decided as a matter of law

The government contractor defense is an established component of federal common law,
recognized by the Supreme Court more than twenty years ago in *Boyle v. United Technologies
Corp.*, 487 U.S. 500 (1988). The defense has been broadly applied in a variety of contexts. *See,
e.g., Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir. 1990) (crash of an Army National
Guard helicopter); *Miller v. Diamond Shamrock Co.*, 275 F.3d 414 (5th Cir. 2001) (civilian
workers exposed to Agent Orange while working on military aircraft); *Oliver v. Oshkosh Truck
Corp.*, 96 F.3d 992 (7th Cir. 1992) (crash of a military truck); *Butler v. Ingalls Shipbuilding, Inc.*,
89 F.3d 582 (9th Cir. 1996) (defective ladder aboard military ship).

In enunciating the government contractor defense in *Boyle*, the Supreme Court
recognized that contractors supplying equipment to the United States military pursuant to
military specifications should be afforded the same protections from suit that the government

would be afforded if the government had manufactured the equipment itself.

> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of [the Federal Tort Claims Act]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. . . . [I]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.
> *Boyle,* 487 U.S. at 511-12.

The government contractor defense has three prongs that, if satisfied, preclude liability under state law. First, the U.S. must have approved reasonably precise specifications. Second, the equipment must have conformed to those specifications. Third, the supplier must have warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Id.* at 512.

The government contractor defense is appropriate for disposition as a matter of law at the summary judgment stage. *See, e.g., Lewis v. Babcock Industries, Inc.,* 985 F.2d 83 (2d Cir. 1993); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67 (3d Cir. 1990); *Ramey v. Martin-Baker Aircraft Co.,* 874 F.2d 946 (4th Cir. 1989); *Miller v. Diamond Shamrock Co.,* 275 F.3d 414 (5th Cir. 2001); *Tate v. Boeing Helicopters,* 140 F.3d 654 (6th Cir. 1998); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992 (7th Cir. 1992); *Butler v. Ingalls Shipbuilding, Inc.,* 89 F.3d 582 (9th Cir. 1996); *Brinson v. Raytheon Co.,* 571 F.3d 1348 (11th Cir. 2009). Even in *Boyle,* the Supreme Court authorized the Fourth Circuit to dispose of the case as a matter of law on remand, rejecting plaintiff's argument that his Seventh Amendment right to a jury trial would be abrogated. *Boyle,* 487 U.S. at 513-14.

Huntington Ingalls is entitled to summary judgment as a matter of law because the three prongs of the government contractor defense have been met.

HUNTINGTON INGALLS INCORPORATED'S
MOTION FOR SUMMARY JUDGMENT

b.    **The first prong of the government contractor defense is met because the U.S. Navy approved reasonably precise specifications for the construction of the *USS Enterprise***

The first prong of the government contractor defense requires the defendant to show that the government established or approved reasonably precise specifications. *Boyle*, 487 U.S. at 507-08. "The government contractor defense is available to a contractor that participates in the design of the product, so long as the government examined the design specifications and exercised ultimate responsibility for making the final decisions." *Chicano v. General Electric Co.*, 2004 WL 2250990 *12 (E.D.Pa. 2004) (citing *Koutsoubos v. Boeing Vertol*, 755 F.2d 352, 355 (3d Cir. 1985)).

The first prong is established here through the declarations of Retired U.S. Navy Admiral Roger B. Horne, Jr., and Retired U.S. Navy Commander Thomas McCaffery. Admiral Horne served in the U.S. Navy from 1956 to 1991. Throughout his Naval career, he concentrated in areas of ship design, engineering, construction, overhaul, and inspection. He has served in various roles in Naval Sea Systems Command ("NAVSEA"), including, but not limited to, Chief Engineer and Deputy Commander for Ship Design and Engineering. He has also served at Puget Sound Naval Shipyard, Mare Island Naval Shipyard, and Ingalls Shipyard. Admiral Horne is qualified and knowledgeable in all aspects of ship construction, design, overhaul and repair of warships, inspections and has supervised and is familiar with the process by which U. S. Navy ships are authorized, designed, and contracted for by the Navy. Declaration of Admiral Roger B. Horne, Jr. ("Horne Decl."), ¶ 2, and Horne's Report attached thereto as Exhibit 1.

Commander McCaffery served in the U.S. Navy from 1964 to 1997. He has been a member of the Society of Naval Architects and the Marine Engineers and the Advisory Committee, American Merchant Marine History Project. In addition, I am a maritime technical consultant and researcher. He has developed expertise regarding United States Navy ship design, development, maintenance, construction and repair, including the mandatory nature of compliance with military specifications and the level of control and supervision exercised by the United States Navy over all equipment installed aboard a United States Navy vessel. Declaration

of Thomas McCaffery ("McCaffery Decl.") ¶¶ 2-3, and McCaffery's Report attached thereto as Exhibit 1.

Admiral Horne's report explains the process of construction and repair of naval ships and supports the first two elements of the government contractor defense. This demonstrates that any and all work performed on Navy ships were performed to the requirements specified by the Navy, and that work was reviewed, inspected and tested by Navy personnel in the vendor's plant and in the shipbuilding yards and training facilities. Horne Decl., ¶ 4. U.S. Navy contracts for all warships incorporated directives, standards, and military specifications that the builder had to comply with. The contracts for Navy ships incorporated varying levels of general and detailed Navy specifications and contract plans. The Navy specifications and contract plans incorporated additional, equally precise, specifications for the ship design, as well as the equipment, components, and materials to be used in its construction. For example, military specifications for equipment intended for use aboard Navy vessels (or "MilSpecs") were drafted, approved and maintained by the Navy, specifically NAVSEA, to address all aspects of shipboard equipment and materials requirements, including the materials to be used and whether materials were to contain asbestos; and any changes to these specifications were controlled by the Navy. These MilSpecs were incorporated into the contract specifications. Thus, there are dozens, perhaps hundreds of precise specifications for equipment, components, testing, and documentation of any machinery that is purchased by the U.S. Navy for installation aboard its ships. Such detailed requirements for the construction, maintenance, and operation of warships and auxiliaries were necessary because the ships were, and still are, being built to operate in combat zones, and be maintained with material specified and stocked by the Navy. Horne Decl., ¶ 11. All items, government and contractor furnished, would have to conform to the Navy's specifications invoked at the time. Horne Decl., ¶ 7. The builders were not to depart from the Navy's specifications, directives and procedures without an agreed-to change or as directed by the Navy. Horne Decl., ¶ 12.

It is clear that the U.S. Navy issued and approved of precise specifications for the design and construction of its warships, satisfying the first prong of *Boyle*.

HUNTINGTON INGALLS INCORPORATED'S
MOTION FOR SUMMARY JUDGMENT

### c.   The second prong of the defense is satisfied because the *USS Enterprise* conformed to the Navy's specifications

The second prong of the defense requires defendant to show that the products manufactured by defendant conformed to the government's specifications. *Boyle*, 487 U.S. at 507-08. "Acceptance and use of an item following its production can establish that the item conformed to its specifications." *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir. 2001) (*citing Kerstetter v. Pacific Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000); *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 575 (5th Cir. 1996); *see also In re: "Agent Orange" Product Liability Litigation*, 304 F.Supp.2d 404, 434 (E.D.N.Y. 2004) ("In its simplest terms, a product conforms with government specifications when the government 'receive[s] what it sought'") (*quoting Lewis v. Babcock Industries, Inc.*, 985 F.2d 83, 89 (2d Cir. 1993).

The declaration of Admiral Horne confirms that the *USS Enterprise* conformed to the U.S. Navy's specifications because they would not have been commissioned otherwise. Horne Decl., ¶ 13. There is no dispute that the *USS Enterprise* was accepted and commissioned by the U.S. Navy. All Navy ships had to conform to the Navy's exacting standards and specifications in order to be accepted and commissioned into the Navy's fleet. Therefore, it is undisputed that *USS Enterprise* conformed to the precise specifications issued by the U.S. Navy.

### d.   The U.S. Navy's state-of-the-art knowledge concerning the potential risks associated with exposure to asbestos satisfies the third prong of Boyle

The third prong of the government contractor defense requires defendant to show that it warned the United States about the dangers in the use of the products that were known to the supplier but not to the United States. *Boyle*, 487 U.S. at 507-08. This requirement can be satisfied through evidence that the Navy had superior knowledge than the contractor regarding the dangers of asbestos. "The contractor's duty to warn under the third prong of *Boyle* extends only to those dangers in the use of the equipment which are unknown to the government." *Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587, 590 (N.D.Cal. 1993). The defense does not require the contractor to warn the government where the government knew as much or more than the contractor about the hazards of the product. *Beaver Valley Power Co. v. National*

15

*Engineering & Contracting Co.*, 883 F.2d 1210, 1216 (3d Cir. 1989); *see also Chicano v. General Electric Co.*, 2004 WL 2250990, *13 (E.D. Pa. 2004) (finding that the defendant satisfied the third prong by showing that the government knew as much or more of than the contractor about the dangers of asbestos); *Blackman v. Asbestos Defendants (BHC)*, 1997 WL 703773, *3 (N.D.Cal. 1997) (finding that defendant contractor had no duty to warn the Air Force of dangers of asbestos use in military equipment where the contractor was not an asbestos manufacturer and "had no greater opportunity to know of the dangers of asbestos in the 1970s than did the USAF").

The undisputed evidence establishes that the U.S. Navy knew as much or more than its contractors regarding the use of asbestos.  In fact, no private shipbuilding company, including Huntington Ingalls, would have had more knowledge of the health hazards of asbestos and/or asbestos-containing materials than the U.S. Navy.  McCaffery Decl., ¶ 8.  The U.S. Navy created and staffed an Industrial Hygiene function within its Bureau of Medicine and Surgery ("BUMED") to help deal with the effects of chronic exposures to the large number of materials used in ship construction and repair.  BUMED was specifically assigned responsibility for evaluating, monitoring and controlling disease from chronic exposures to hazardous materials.  By the time the U.S. Navy began designing the *USS Enterprise*, it had been studying the effects of asbestos dust for decades.  Through the efforts of the U.S. Navy's medical and industrial health professionals it had a much greater knowledge about the hazards of asbestos that Huntington Ingalls.  McCaffery Decl., ¶ 9.

The U.S. Navy's occupational health program in effect while Robertson was on the *USS Enterprise* included occupational physicians and industrial hygienists who were aware of the toxicology of asbestos as it existed during the time.  Rabinovitz Decl., ¶ 8.  It is undisputable that the U.S. Navy had superior knowledge regarding the potential hazards of asbestos exposure, which extinguishes Huntington Ingalls's duty to warn the Navy under the third prong of *Boyle*.

In sum, the U.S. Navy controlled every aspect of the design, construction, and material composition of its Navy ships, like the *USS Enterprise*.  The Navy specified the materials to be used and required strict conformity by the builders.  Huntington Ingalls had no duty to warn the

Navy about the potential hazards of exposure to asbestos because it was already known to the Navy.

### 4.   Plaintiffs' Failure to Warn Claims Fail as a Matter of Law Because Huntington Ingalls Had No State Law Duty to Warn the U.S. Navy of the Potential Hazards of Exposure to Asbestos Because the U.S. Navy Was a Sophisticated User

For the reasons stated above, Huntington Ingalls had no duty to warn the U.S. Navy, the purchaser and end user of the *USS Enterprise*, of the potential risks of asbestos exposure. Generally, failure to warn products liability law in Virginia is consistent with California in that a manufacturer has a duty to warn users of the dangers associated with a product only "if the manufacturer has reason to believe that they will not realize its dangerous condition." *Artiglio v. General Electric Co.*, 61 Cal.App.4th 830, 835 (1998) (internal quotation marks and citations omitted, emphasis added.) Thus, "[u]nder the sophisticated user defense, sophisticated users need not be warned about dangers of which they are already aware or should be aware." *Johnson v. American Standard, Inc.* 43 Cal.4th 56, 65 (2008). "The defense is considered an exception to the manufacturer's general duty to warn consumers, and . . . acts as an affirmative defense to negate the manufacturer's duty to warn." *Id.* Although not controlling in this case, the California Supreme Court's explanation of the "sophisticated user" defense is helpful in understanding how the defense should be applied in Virgina.

A sophisticated user is one that is charged with knowing the particular product's dangers because "the danger in question was so generally known within [the user's] trade or profession that a manufacturer should not have been expected to provide a warning specific to the group to which plaintiff belonged." *Id.* at 72. In *Akin v. Ashland Chemical,* 156 F.3d 1030, 1037 (10th Cir. 1998), cited by the California Supreme Court in *Johnson*, the Tenth Circuit held that the U.S. Air Force was a sophisticated purchaser to whom a manufacturer owed no duty to warn of the dangerous propensities of low-level chemical exposure.

> Because of the wealth of research available, the ability of the Air Force to conduct studies, and its extremely knowledgeable staff, we find that the Air Force easily qualifies as a "knowledgeable purchaser" that should have known the risks involved with low-level chemical exposure. Employees of the Air Force are also

17

> deemed to possess the necessary level of sophistication, so that
> defendants had no duty to warn the Air Force or its employees of
> the potential hazards.  *Id.*

The U.S. Navy was an equally sophisticated user of asbestos.  The Navy possessed the most advanced information on issues of industrial hygiene and asbestos medicine, including the any potential risks involved with the use of asbestos-containing components and materials, and in fact, the Navy required the use of asbestos-containing materials in the construction of its warships.  The Navy easily qualifies as a sophisticated user of asbestos and asbestos-containing components, and Huntington Ingalls had no duty to warn the Navy about any potential dangers relating to its use.  The sophisticated user defense negates any duty by Huntington Ingalls to warn the Navy of the potential health risks associated with exposure to asbestos.  Therefore, Huntington Ingalls cannot be liable to plaintiffs for negligence based on a failure to warn theory.

     5.      **Even if Huntington Ingalls Had a Duty to Warn Under Virginia Law, It Would Be Immune From Liability Because the Government Contractor Defense is a Complete Defense to Plaintiffs' Failure-to-Warn Claims**

     a.      **The government contractor defense applies to failure to warn claims**

Though *Boyle* was a design defect case, "[i]t is well established that the government contractor defense is not limited to design defect causes of action, but also applies to failure to warn claims."  *Faddish v. General Electric Co.*, 2010 WL 4146108, *7 (E.D.Pa. 2010); *Russek v. Unisys Corp.*, 921 F.Supp. 1277, 1292 (D.N.J. 1996) ("[T]he federal appellate courts that have addressed the issue . . . have all concluded that *Boyle* applies to failure to warn claims").

To establish the government contractor defense in the failure-to-warn context, a contractor must show that (1) the government provided warning directives, (2) the contractor complied with those directives, and (3) the contractor either warned the government about the hazards of asbestos, or the government knew about the hazards of asbestos.  *Faddish*, 2010 WL 4146108 at *7.  With respect to the first prong, the contractor "does not have to show an express government prohibition on all warnings, but rather must establish that the government 'exercised its discretion' regarding warnings to be placed on defendant's product."  *Id* at *9; see also Butler v.*

*Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996) (citing *In re Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992)) (noting the defense applies as long as there is evidence that in making the decision whether to provide a warning, the contractor acted in compliance with reasonably precise specifications imposed on it by the government).

> **b.**   **The U.S. Navy controlled the content of warnings on the *USS Enterprise* and would have rejected an attempt by Huntington Ingalls to warn about asbestos**

The U.S. Navy was intimately involved in determining what written materials and warnings could accompany the contractor's product. The Navy's specifications for the construction of Navy ships covered the nature of any communication affixed to the ship. Horne Decl., ¶ 15-16. The Navy exercised its discretion over the type and content of warnings that reflected its judgment as to what hazards required a warning and its policy decisions relating to injury and disease prevention. As explained in the declarations of Horne, McCaffery, and Rabinovitz, shipyards would not have been permitted to attach any type of warning or cautionary statement not required and approved by the Navy, including any statements related to asbestos, without prior discussion, approval and acceptance by the Navy. Under the circumstances, Huntington Ingalls could not have placed effective warnings on the *USS Enterprise* that would have had any impact whatsoever on the alleged exposure to Robertson. There is simply no practical or feasible way to communicate an effective warning with respect to the ship as a whole. In fact, the U.S. Navy did not consider asbestos containing materials, including pipe covering and similar thermal insulation materials, to be sufficiently hazardous or toxic to require warning labels until after 1970. Further, the Navy does not consider and has not considered the use and removal of asbestos containing packing and gaskets under normal conditions to create an asbestos hazard.

## IV.    CONCLUSION

For the foregoing reasons, Huntington Ingalls respectfully requests that the Court grant

19

summary judgment in its favor as to all causes of action alleged in plaintiffs' complaint.

DATED: January 30, 2012                    RESPECTFULLY SUBMITTED,


                                By:  /S/ Daniel J. Kelly_____
                                     Daniel J. Kelly
                                     TUCKER ELLIS & WEST LLP
                                     135 Main Street, Suite 700
                                     San Francisco, CA 94105
                                     Telephone: 415.617.2400
                                     Facsimile: 415.617.2409
                                     daniel.kelly@tuckerellis.com

                                     Attorneys for Defendant
                                     **HUNTINGTON INGALLS
                                     INCORPORATED**